**RECEIVED**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF WESTERN PENNSYLVANIA: ERIE DIVISION
-----------------------------------------------------------x

JUL - 7 2010

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

N.Elizabeth Cook

             Plaintiff,

Case No. *10-164 Erie*

-against-

**COMPLAINT**

Edinboro University of Pennsylvania
Pennsylvania State System of Higher Education
Chief THOMAS O. NELSON, in his personal capacity,
Dr. KAHAN SABLO, in his personal capacity,
JACK DANERI, in his personal capacity,
ANTHONY BOZICH, in his personal capacity

             Defendants.

-----------------------------------------------------------x

The Plaintiff, N.Elizabeth Cook, hereinafter referred to as "Plaintiff," filing pro se, complains as follows:

## I. NATURE OF THE CLAIMS

**1.1** This is a multiple civil rights violations and personal injury case brought pursuant to:

42 U.S.C. § 1983;
18 U.S.C. § 3771
47 U.S.C. 223(h)(1);
26 U.S.C. ch. 53;
20 U.S.C. § 1681;
20 U.S.C. § 1232g;
20 U.S.C. § 1092;
18 U.S.C. 926;
Violence Against Women and Department of Justice Reauthorization Act of 2005;
U.S. Constitution Amendments 1,2,4,5,6,8,9,14;
Pennsylvania Uniform Firearms Act;
Pennsylvania Uniform Single Publication Act (regarding defamation,libel,slander)
42 PA. CONS. STAT. § 7102 (regarding negligence)
Pennsylvania Crimes Code (Title 18).

## II. JURISDICTION AND PARTIES

**2.1** At all relevant times herein, Plaintiff was an alumni of Edinboro University of Pennsylvania, hereinafter to referred to as "E.U.P.", who earned her undergraduate degree from E.U.P. in May 2007.

**2.2** Defendant E.U.P. is an institution of higher learning located in Erie County, Pennsylvania, which is located within the Western District.

**2.3** E.U.P. is part of the Pennsylvania State System of Higher Education, hereinafter referred to as "P.A.S.S.H.E.". Among other things, P.A.S.S.H.E. seeks and disperses federal funds to the fourteen institutions of higher education that comprise that organization. As such, E.U.P. is an "educational program or activity receiving Federal financial assistance," within the meaning of Title IX.

**2.4** Defendant Thomas O. Nelson, hereinafter referred to as "NELSON," has served at all relevant times herein as the Chief of Campus Police at E.U.P.

**2.5** Defendant Kahan Sablo, hereinafter referred to as "SABLO," was at all relevant times herein the Dean of Student Affairs, and for part of the times herein has served as Acting Vice President for Student Affairs at E.U.P.

**2.6** Defendant Jack Daneri, hereinafter referred to as "DANERI," has worked for the District Attorney's office at all relevant times.

**2.7** Defendant Anthony Bozich, herinafter referred to as "BOZICH," has worked for the District Attorney's office at all relevant times.

**2.8** Federal jurisdiction is present based on Title IX pursuant to 28 U.S.C. § 1343.

**2.9** Venue is proper in this district pursuant to the general venue statute, 28 U.S.C. §1391.

## III. STATEMENT OF FACTS

**3.1** Plaintiff is a caucasion female, non-traditional student in her forties, who grew up in Pennsylvania. Plaintiff is a former high school dropout due to teenage pregnancy, former military wife, mother, grandmother, Licensed Practical Nurse and domestic violence overcomer, who pursued her bachelor's degree over fifteen years in several

2

colleges and several states, having earned her GED in 1991 following the birth of her third child. Plaintiff attended

Practical Nursing School in 1994, following her first divorce.

**3.2** Plaintiff first matriculated as an Undergraduate non-traditional student at E.U.P. in or about the Fall of 2000,

during her second marriage, and attended for two years. Plaintiff withdrew because of circumstances involving

interstate custody interference and concealment of her youngest child in 2001, when her son went for his summer

visit with his abusive father in another state and never returned, and her second daughter got involved in a violent

relationship with a drug addict and got pregnant.

**3.3** Plaintiff also had female health problems during this time period, resulting in hysterectomy in 2004. Plaintiff

was also diagnosed on or about the year 2004 with Osteoarthritis, Degenerative Joint Disease and Occipital

Neuralgia, and was recommended by her Rheumatologist to transition from floor nursing to a less physically

demanding career field as quickly as possible to prevent further strain.

**3.4** Plaintiff was able to return to E.U.P. in Fall 2005.

**3.5** Plaintiff also  worked full time as a nurse during her enrollment, and was also involved in long distance court

proceedings in another state, where she had located her son. During this time, Plaintiff's second marriage

deteriorated; this being mainly due to husband's immaturity and poor work history during the financially and

mentally abusive marriage, along with the other emotional stressors in Plaintiff's life.  In addition, Plaintiff suffers

chronic physical pain which varies in intensity from day to day, from above diagnosises.

**3.6** Plaintiff earned her undergraduate degree from E.U.P. in May 2007. Although it had taken Plaintiff fifteen years

to obtain her bachelor's degree, Plaintiff did not attend her graduation ceremony because she did not want to

shake the hand of the president who was in office at that time. Plaintiff refused to shake the president's hand due

to an incident the prior Fall, when an 18 year old African American male had been criminalized by E.U.P. for

sending an email to twenty people that contained the "N" word.  At that time, NELSON made it very clear to the

national media that racism and terrorism were taken very seriously and were not tolerated at E.U.P.

**3.7** Plaintiff  was accepted to Graduate School at E.U.P. for the Fall, but decided to move with her husband to

3

another state, looking for a "fresh start" for the marriage.  The other state is where the couple had met in 1994.

Plaintiff spent the summer working at the State Penitentiary as an agency nurse. Plaintiff's husband spent the

summer fishing.

**3.8** In August 2007, Plaintiff rented a car and left her husband in the other state  to attend Grad. School at E.U.P.,

intending to live in the dorms and work part time as an agency nurse to help fill the need for nurses with disabled

students on campus. Plaintiff drove 1400 miles to E.U.P., making it to her first class, which was from 9:30 am to

12:15 pm,  August 28, 2007.  As indicated by her Grad. School application, Plaintiff intended to focus her graduate

studies on seeking grant funding and philanthropy for E.U.P to assist disabled students overcome diversity.

**3.9** Among her personal belongings, Plaintiff had a 22 revolver that had been given to her as a gift in another state

in 1993 when she was divorcing her first husband, who remained violent and harrassing.  As a lawful "private

sale," in the other state, the gun had never been titled in Plaintiff's name.  As a 22 revolver, the gun does not fit the

federal requirements to be "registered" in accordance with the National Firearms Act ("NFA") [26 U.S.C. ch. 53.]

**3.10** During a break in class at approximately 11:00 am, Plaintiff asked a fellow graduate student, who is an expert

on guns, if he could find out for her how or where she could safely store the handgun while she secured a dorm

room and bought her books, knowing that she could not keep the gun in the dorms.  Plaintiff was not attempting to

sell the gun, and was not committing a crime with the gun, only trying to find out how to store it safely.

**3.11** At approximately 12:15 pm, Plaintiff was called out of class by NELSON and another police officer. NELSON

called her out of class by her first married name although Plaintiff had never attended E.U.P. by that last name.   It

alarmed and frightened Plaintiff to be called out of class by that name. Plaintiff thought that something bad had

happened to her 15 year old son, who at that time she had not seen in five years due to custody interference.

NELSON informed Plaintiff that a professor had filed a complaint against her because her estranged husband had

telephoned the professor from 1400 miles away, and accused the professor of having an inappropriate sexual

relationship with the Plaintiff during undergraduate school.  NELSON alleged the professor told him the estranged

husband said the Plaintiff had left him for the purpose of going to grad school to conduct an illicit affair.

**3.12** NELSON verbally warned Plaintiff at the professor's request, to have no contact with the professor, Dr. Frank Taylor, now deceased, but did not cite Plaintiff for harrassment or any other charges.

**3.13** Plaintiff told NELSON that her estranged husband was actually the one doing the harrassing. Plaintiff showed NELSON and the other officer a cellphone text from her estranged husband that said, "Fuck off and die."

**3.14** NELSON asked Plaintiff if her estranged husband might follow her to E.U.P. and cause trouble on campus. Plaintiff informed NELSON that she did not think so.   NELSON told Plaintiff that if she received any harrassing emails, to forward them to him. NELSON advised Plaintiff  that he would help her get a protective order, if needed.

**3.15** Plaintiff declined NELSON's offer to help her get a protective order.   Plaintiff was in a physically and emotionally exhausted state.  During the conversation,  Plaintiff was also recovering from the alarmed state of being pulled out of class by two police officers using the last name of her children.  Plaintiff was also under the stress of still needing to secure a dorm room, buy books, unload and return a rental car, and buy groceries. Plaintiff forgot all about the gun, and did not ask NELSON how to safely store it.

**3.16** Plaintiff spent the rest of August 28, 2007 securing a dorm room, buying books, attending class from 2:00-3:15 pm, going to Walmart  from approximately 3:30 pm until 4:30 pm, returning to campus, and eating supper in the dining hall from approximately 4:45 pm until 5:15 pm.  Plaintiff spent the rest of the evening unloading the rental car, and then fell into bed fairly late, happy to have accomplished so much that day.  As a former high school dropout, Plaintiff was proud and happy  to be spending the night in her new dorm room as a graduate student..

**3.17** Plaintiff had no classes on August 29, 2007 and slept in late that morning.  Plaintiff then went to the dining hall and ate, spent some time investigating Earp Hall, went to the library, and spent some time on the internet..

**3.18** In mid afternoon on August 29, 2007, Plaintiff received a harrassing email from her estranged husband that was sent by him at 1:42 pm.   Plaintiff forwarded the email to NELSON at 2:28 pm, as NELSON had instructed her to do.  The email implied serious mental illness on the part of the Plaintiff involving fantasies and/or hallucinations. The harrassing email that the Plaintiff sent to NELSON alleged the professor had reported her to the police for "stalking."  The email also  mentioned speaking to all of the Plaintiff's relatives about the situation, and said in part,

> *"I told them all about whats going on between us. The truth, not whats in your make-beleive world. I also told of the accusation of stalking Taylor, and Chompalov. They are all really worried about you...please seek professional help. Please. Your family is extremely worried about you...Your falling apart, and your headed for disaster."*

Plaintiff went to the library, went to Walmart for some groceries that did not require refrigeration, and ate tuna fish on crackers for supper in her room, proud to be a grad student living in the dorms.

**3.19** At approximately 6:00 pm, Plaintiff answered a knock at the door, and discovered Officer Robert Burns. Burns told her that he had been told that she needed assistance with storing a gun.

**3.20** Plaintiff thanked Officer Burns for coming to her aid. She retrieved the unloaded gun, which she had safely stored in the bottom of a closet. She retrieved 17 bullets which she had stored in a drawer across the room. Plaintiff went with Burns to the E.U.P. police station, where Burns placed the gun in storage. Burns gave Plaintiff a storage receipt for the gun and bullets. Burns informed Plaintiff that she could pick the gun up at the end of the school year. At all times during the transaction, Burns acted professionally and gave no indiction that Plaintiff had committed a crime. Plaintiff thanked Burns, and told him that she hoped to find an alternate off campus storage solution for the gun prior to the end of the school year. Plaintiff left the police station at approximately 6:20 pm.

**3.21** Within the hour after leaving the police station, Plaintiff received a phone call from her panic stricken adult daughter claiming that she had just been told by telephone from her stepfather, from 1400 miles away, that Plaintiff had been "waving a gun around on campus," and was going to be kicked out of graduate school. The adult daughter told Plaintiff that her stepfather said he was going to tell all of Plaintiff's family members in several states, including her elderly parents, that Plaintiff was acting "psycho" and "waving a gun around on campus."

**3.22** Plaintiff calmly reassured her daughter that she had just left the police department after placing her gun in storage, had not been acting psycho or waving a gun around, and was not getting kicked out of class.

**3.23** On August 29, 2007, at 6:32 pm, Plaintiff sent an email to her elderly parents in another state, both cardiac patients, asking that they not listen to any strange stories they may hear from the estranged husband, and reassuring them that she was settling into her room and everything was fine.

**3.24** On August 29, 2007, at 7:42 pm, Plaintiff sent an email to the late Dr. Frank Taylor, promising not to go near him, and mentioning that in addition to accusing her of having an affair, her estranged husband in another state was now actually telling people that she was getting kicked out of school for waving a gun around on campus.

**3.25** Shortly thereafter, Plaintiff received another telephone call from her adult daughter. She said that she herself had spoken with NELSON, and told Plaintiff that the police were looking for her and she was in "big trouble."

**3.26** Shortly thereafter that, Plaintiff received a knock on her door by unknown police officer who asked her to come back over to the police station because there was a problem with the gun.

**3.27** Upon arriving at the police station, Plaintiff was greeted by NELSON and SABLO, who told her that they had been looking for her because she was in "big trouble."

**3.28** NELSON did not read Miranda Rights to the already exhausted Plaintiff, or suggest she contact an attorney.

**3.29** A very lengthy, extremely emotionally traumatizing, and unprofessional interrogation by NELSON and SABLO followed. By way of example, and not of limitation, misconduct included the following:

**a.** NELSON and SABLO alleged that Plaintiff had committed three unspecified federal felonies that she could go to jail for twenty years for and lose her nursing license, because the gun was not "registered."

**b.** NELSON and SABLO refused Plaintiff's insistance on referring the matter to the off campus police, telling Plaintiff that she wasn't thinking clearly, and that they knew what was best for her, she did not.

**c.** NELSON and SABLO told Plaintiff that if she signed a paragraph agreeing to voluntarily withdraw, and agreed to spend the night at a hotel, and agreed to gather her belongings the next day under one on one police guard, her disciplinary action would not show up on her educational record, her "crimes" would not show up on a criminal record, and she would not be charged fees for the semester if she just discretely went away.

**d..** Plaintiff protested for hours, telling NELSON and SABLO that her rental car was due to be returned the following Saturday, she had no car, she had nowhere to go as she had intended to live in the dorms, and she had no money or job. NELSON and SABLO called her words such as "emotional" and "belligerent."

**e.** SABLO told Plaintiff, "even though the semester has already started, you seem pretty smart and shouldn't have

7

any problem calling around and getting admitted into any other grad school in Pennsylvania, depending on their numbers." He said, "you can apply to any of the other P.A.S.S.H.E. schools, just not E.U.P." Plaintiff asked SABLO if he would be willing to help her arrange that, and he replied, "no."

f. At approximately 11:00 pm, physically and emotionally exhausted, Plaintiff wearily signed the withdrawal paragraph given to her by SABLO, protesting because her name had been misspelled. SABLO replied, "it doesn't matter." Plaintiff agreed to spend the night at the Edinboro Inn, which was arranged and paid for by SABLO.

g. Plaintiff suspects that part of NELSON's demeanor towards her was in retaliation for the fact that she had appealed a parking ticket the prior Spring. Then, as a commuter student, she had parked in a space directly under a "C" (commuter) sign that was shown on the then current campus map to be a commuter lot. NELSON had denied the appeal, and Plaintiff was charged an additional $5.00 fee for time of the appellate process, of which she complained. Plaintiff was told if she did not pay the parking ticket and fee she would not graduate. Plaintiff had told many people about the ticket, and suspects NELSON resented that on the night of August 29, 2007.

h. Plaintiff suspects that part of NELSON and SABLO's demeanor towards her was also in retaliation for the previous spring, when Plaintiff made her opinion very well known on campus that she felt that NELSON and the prior President, who was African American, showed racism against underprivileged black youth when they had criminalized the 18 year old black boy in national media and sent him to jail for sending an email using the "N" word, which is part of the culture that he had grown up in as African American- NOT an act of racism or terrorism.

3.30 On August 29, 2007 at or about 11:30 pm, Plaintiff was not given a copy of the "voluntary withdrawal" she had signed. She was given a letter from SABLO, barring her from campus by permanent facilities restriction. She was instructed to never enter campus property without written permission from SABLO or NELSON, and threatened with *Defiant Trespass* arrest if the Plaintiff disregarded the permanent facilities restriction.

3.31 NELSON also spoke several times with college professors and the Plaintiff's daughter, without having first obtained the Plaintiff's consent. NELSON told the daughter that she was "in charge" of the Plaintiff, and told the Plaintiff's daughter, "your mother could be in big trouble right now for what she did." NELSON told the Plaintiff's

8

daughter that after the Plaintiff left campus, she should "keep an eye on your mother just in case she tries anything else, and let me know if she does."

**3.32** At no time was Plaintiff ever given notice of accusation providing the legal citation for the "three federal felonies" or citations of any other crimes under federal or Pennsylvania law that she allegedly committed. Based upon police blotter information obtained from E.U.P. in Spring 2010 under Pennsylvania Open Records law request, Plaintiff believes that she did not actually commit any crimes under federal or Pennsylvania law, and that it was actually NELSON and SABLO who committed the crime(s) while acting under color of law.

**3.33** Plaintiff has never denied the fact that she accidentally committed a campus rule book violation while attempting to avoid a campus rule book violation by asking for assistance following an interstate move.

**3.34** Plaintiff spent the night at the Edinboro Inn, and telephoned NELSON the next morning as intructed. She met Officer Ted Duncan at a designated meeting spot . He accompanied her one on one for several humiliating and embarrassing hours, while she repacked her belongings into the rental car and returned her books. At all times during the confinement, Officer Duncan acted professional and courteous. Plaintiff then turned her ID card over to Officer Duncan as he requested, and left the campus in her rental car, with no sure plans of where to go.

**3.35** Plaintiff then went and placed all of her belongings in storage and made telephone calls to every homeless shelter and women's shelter in Erie County, including the men's only shelter, trying to find a place to go. There were no openings anywhere.

**3.36** On August 30, 2007, Plaintiff telephoned Judicial Affairs officer, Victoria Wetsell, who she thought may be kind to her. She had been kind to her the previous year, when Plaintiff had taken CLEP exams for college credits. Plaintiff informed Wetsell that there were no beds anywhere at any homeless shelter, and begged her to reconsider the decision. Wetsell yelled into the telephone at Plaintiff that there was "absolutely no exceptions to the zero tolerance policy." Plaintiff suggested to Wetsell that this was unsafe policy, telling Wetsell, "you people think I'm such a danger that I needed one on one police escort, yet you haven't even referred me for a psychiatric evaluation. You are making me homeless, knowing that I do not have a car, and have just left a husband and

driven 1400 miles. How do you know I don't have another gun out there somewhere that I may not come back and shoot you all with in my current mental state!?" Wetsell asked Plaintiff "are you threatening an act of campus violence? Because if you are threatening an act of campus violence or terrorism, you are going to be in big trouble sister Sue." Plaintiff hung up on Victoria Wetsell without saying goodbye, which she does not usually do.

**3.37** Plaintiff's daughter was in the middle of moving, and was herself staying with in-laws that week. She had access to her old rental unit for one more day. Plaintiff spent the night of August 30, 2007 sleeping on the floor of a vacant rental house, without utilities, after spending the previous day making unsuccessful inquiries of other colleges to see if numbers indicated they could accept her. Sleeping on the floor, without utilities, was not as comfortable as it had been two nights before, when the Plaintiff had spent the night in her new dorm room.

**3.38** On August 31, 2007, Plaintiff voluntarily committed herself to a five day inpatient stay at Stairways Behavioral Health center for a psychiatric evaluation. Staff there were very kind, and assisted her in returning her rental car.

**3.39** Plaintiff was found to be suffering from homelessness, anxiety, and insomnia. In addition, it was discovered that Plaintiff's blood pressure was dangerously high, which was followed by nurses during the five days and then followed up on by Community Health Network "homeless care" program for one year.

**3.40** Upon discharge from Stairways, Plaintiff moved in with her daughter and son in law's new apartment, sleeping on an air mattress on the floor, and found a job within the month. Although she had no furniture but an air mattress, Plaintiff moved into her own apartment on or about October 1, 2007 and began looking at other grad schools to apply to for Spring 2008 semester.

**3.41** Plaintiff applied to Clarion University graduate school for Rehabilitative Sciences. Soon after, Plaintiff received a letter from E.U.P. informing her that they could not release her transcript to Clarion, because she had an unpaid tuition bill from the Fall semester. (In spite of SABLO's promise that she would not be charged for the semester if she spent the night in the hotel and went away discretely.) She was told she needed to come to campus to straighten out the bill or she would be reported to the credit bureau and/or the Attorney General.

**3.42** Plaintiff wrote a letter to University President, Jeremy Brown, explaining the situation to him and asking him

10

for his help to clear her account, release her transcripts, and possibly arrange for limited permission for her to come to campus for private duty nursing jobs with disabled students through private staffing agency contract. She thought that this request may be granted, since the original letter from SABLO had said that she *could attend university sponsored events with written permission*. These disabled student cases are often difficult to staff.

**3.43** Brown referred the letter to SABLO, who  replied to Plaintiff's letter, enforcing that she was not permitted on campus, for any reason,  ever, and if she was found on campus she would be charged with trespassing.

**3.44** The tuition fiasco was cleared up, but Plaintiff missed the application deadline for Clarion University.

**3.45** In early 2008, Plaintiff entered a new relationship, and later that year moved out of the Erie area.

**3.46** Concerned for the disposition of the gun, Plaintiff wrote a second letter in August 2008 which was answered by  two letters from Administrator Valerie Hayes, to both her old address and her new address,  enforcing SABLO's earlier letter prohibiting her from entering university property.  Hayes informed her that "per Pennsylvania law," if the gun was not picked up by a registered owner by December 19, 2009, petition would be made to the District Attorney for disposal of the gun. No definition was given for the term, "registered owner."

**3.47**  In the meantime, the body of an 18 year old African American male was found hanging in the window of Lawrence Towers, a coed dormitory, on the morning of September 14, 2008.  NELSON released no information to the media regarding whether it was a murder or a suicide, out of respect for the family.  Police records that Plaintiff obtained under the PA Open Records Law, indicate that the boy had been cited by campus police for underage drinking, a statutory offense, the night before, and a full thirty one (31) hours passed after the time that he had been cited by campus police and the time that his body was spotted hanging in the window by a construction worker.  The boy had been permitted to remain on campus during that time period, unlike Plaintiff, who was placed under guard and forced to leave campus within hours of her rulebook violation.  This was also unlike the other 18 year old African American male who had sent the email in 2006 and was immediately sent to jail by NELSON.

**3.48** On June 6, 2009, Plaintiff's favorite college professor, Dr. Frank Taylor, passed away, having suffered either a heart attack or a stroke while out riding his motorcycle. This was the one who she had been accused of sleeping

with and the one who had asked NELSON to talk to her after reporting her estranged husband's phone calls to campus police on or about August 28, 2007. This was also the one who NELSON had discussed the investigation with and told of the Plaintiff's pending withdrawal. The Plaintiff could not attend his memorial service due to permanent facilities restrictions, which caused her to experience deep distress at the primordial level. On or about August 30, 2009, the Plaintiff came to campus and had her picture taken standing in the flower bed as an act of defiance, to demonstrate that if a gunman or gunwoman or other actual dangerous person really wanted to come to campus to cause harm, a permanent facilities restriction would not stop the person. The Plaintiff also had her picture taken in front of the library, which had been her usual hangout on campus when she was a student.

**3.49** On November 11, 2009, a triple fatal auto accident claimed the lives of three more young male campus students. It was later revealed in the Erie Times Newspaper that alcohol had not played a factor on the day of the accident. However, the driver of the car at fault, an 18 year old caucasion male, had been cited a few days earlier for reckless driving charges in addition to being cited the previous September for a traffic stop wherein he had bongs and pipes taken from him. In the news story, NELSON said, "he may have been found guilty at the hearing, or may not have been." Possession of drug paraphernalia was not only a rulebook violation, but a crime pursuant to 35 Pa.C.S. §780-113.1(a)(32). In spite of "no exceptions to the zero tolerance policy," the deceased had been permitted to stay on campus from the time of the citation in September until the time of his death, unlike the Plaintiff who in 2007 was found guilty on the spot by NELSON and forced to leave, as was the criminalized African American male emailer in 2006.

**3.50** Plaintiff was distraught over the inconsistent application and enforcement of rulebook violations according to race and gender, which indicated signs of discrimination. In a frustrated fit of rage following the wake of what she believed to be a preventable triple fatal auto accident, Plaintiff wrote angry letters about NELSON and SABLO to the online school newspaper, implying they did not follow the Golden Rule.

**3.51** Plaintiff subsequently received an email from the Erie County Pennsylvania District Attorney's office, asking her to call Anthony Bozich to explain her actions. Plaintiff was visiting Canada, and set appointment to come talk

with Bozich on December 14, 2009 when she would be passing through Erie on her way to another state.

**3.52** On December 13, 2009, on a day with severe winter weather, Plaintiff was traveling by Greyhound bus. She was already running hours behind schedule, and was detained at the U.S./ Canadian border for almost one hour while she was personally searched and her belongings were searched by five obnoxious border control agents, the supervisor being named "Marshall," who repeatedly questioned her as to past criminal history. Agent said, "Come on..surely you would remember if you had been in handcuffs." FBI criminal background check obtained for immigration purposes by Plaintiff in Winter 2009 indicated no criminal history at that time.

**3.53** Eventually, the border agents released her after almost an hour of questioning regarding criminal history or activity. This event inconvenienced other passengers as well as Plaintiff, and caused Plaintiff to miss the last bus to Erie out of Buffalo. Plaintiff spent half the night in the downtown Buffalo Greyhound station, in the worst end of town, until her daughter and son in law picked her up. They themselves were inconvenienced, having to drag a baby out and travel to Buffalo, NY with no notice in poor weather.

**3.54** On December 14, 2009, at 9:00 am, Plaintiff arrived for her meeting with BOZICH. When Plaintiff told BOZICH of the event, BOZICH said, "oh yeah, sorry about that." BOZICH told her that following the school newspaper comments that she had written, NELSON had contacted him and reported her to be investigated for terroristic activity. BOZICH stated that he had placed her on a "watch list" and after talking to her by phone he had meant to take her off of it, but had "forgotten." BOZICH acted indifferent to the inconvenience it caused the Plaintiff to have her passport marked as a terrorist or National threat and be detained and searched at the Border.

**3.55** In a tearful meeting, Plaintiff discussed the gun incident with BOZICH, who agreed that her case was much different than the case of the African American emailer who had gone to jail. He sternly admonished the Plaintiff that if she got upset over student's deaths again, not to threaten NELSON in the online school newspaper again or he would have to charge her with a misdemeanor. He stated that the District Attorney had not yet been petitioned for the disposal of the gun, but assured her that he would be. Plaintiff agreed not to talk bad about NELSON or SABLO or threaten NELSON in the online newspaper, and BOZICH agreed to unmark Plaintiff as a security threat.

13

**3.56** Plaintiff had further email correspondence in January 2010 with President Jeremy Brown, regarding her concerns for poor policy. Brown refused to become engaged in the matter, citing "policy" and referred Plaintiff to P.A.S.S.H.E. Associate Chief Counsel Jacqueline Conforti Barnett, who also claimed, "policy." In response to Plaintiff's concerns , Barnett informed Plaintiff that because of the confidentiality rights of NELSON and SABLO, she could not discuss any discipline that they may have received regarding the incident. Barnett furthermore admonished Plaintiff, telling her that the matter would not be entertained outside of a legal forum because it was a non-sequitar issue, and threatened if Plaintiff came to campus she would be charged with trespassing. Plaintiff sent Barnett the picture of herself standing on the flower bed on campus that she had taken the previous summer. Barnett warned her that if she did it again, she would basically be in big trouble. (paraphrased.)

**3.57** In May 2009, Plaintiff began posting truthful comments on E.U.P.'s facebook page. Among those truthful comments, Plaintiff alleged "if Nick Crea had been treated as I was treated, he would not be dead right now. I bet his mother would have visited him in jail." An unknown party presumably employed by E.U.P., began removing the comments immediately. This action upset the older sister of the deceased boy, who thought that Plaintiff was posting bad things about the deceased boy and quickly deleting them. The sister then found Plaintiff's fiance on facebook, and threatened that if Plaintiff posted anything else bad about her brother on facebook and deleted it to hide her identity, she would press harrassment charges against her. Plaintiff emailed the sister, and explained that she was not the party who was deleting the emails, it was E.U.P., as an act of censorship, contrary to Plaintiff's rights to free speech as guaranteed by the U.S. Constitution.

**3.58** Although she had not wanted to, and tried for almost three years not to, Plaintiff decided to file a lawsuit against the Defendants, in light of the four preventable deaths of young male college students.

**3.59** On May 25, 2010, Plaintiff wrote an apologetic email to NELSON, SABLO, and administrators Hayes and Brown, suggesting that she had come to the conclusion that the only way they were willing to resolve the matter was through civil suit. There was no return reply by either letter or email from any of the recipients of the apology.

**3.60** To begin gathering evidence, Plaintiff made various open records requests. Part of the request, upon the date

14

of this filing, is in the PA Office of Open Records appeal process. E.U.P. demonstrated hostility toward Plaintiff in response to her requests by refusing to tell her what crime she committed, and refusing to release the information from the disposal of the gun, citing "FERPA."

**3.61** Upon receipt of some of the records requests, Plaintiff found it quite obvious that a certain record had been forged, and was not the original record. Plaintiff believes that the document was forged to conceal the commission of a crime, punishable under Pennsylvania law.

**3.62** Plaintiff remained hesitant to file a law suit in the event that the matter should become public record. As part of evidence of breech of confidentiality, Plaintiff will need to submit an email from her ex-husband that alleges "sex for favors" as the way that Plaintiff "got off the hook for felonies." Plaintiff explained this to Administrators in her apologetic email to which there was no reply.

**3.63** E.U.P. administrators, including but not limited to Brown and Hayes, as reasonable people in positions of authority, had the authority to institute corrective measures. They were aware of Plaintiff's numerous complaints of poor policy, and inappropriate, unprofessional, and discriminative behavior by NELSON and SABLO. E.U.P. adminstrators did nothing, choosing instead to turn a blind eye. They further threatened Plaintiff with harrassment charges, and defamed her character by actual malice and negligence by publishing information to her judicial file. NELSON published in Uniform Crime Reports that she had been investigated for a "6111" gun crime, and told the District Attorney's office that she was a "terrorist." They then marked her passport as a National security threat, causing border patrol agents and Greyhound bus patrons to question her character.

**3.64** During this time, in or about Summer 2009, NELSON was interviewed for a local news segment on crime clearance rates at local colleges, which showed E.U.P.'s crime clearance statistics to be one of the poorest in the region. NELSON claimed that they did not get any crimes of violence on his campus. NELSON claimed that the reason E.U.P.'s crime clearance rate was low, was because the kids' college toys were not properly marked. He stated, "your gameboy looks an awful lot like my gameboy. How do I know whose gameboy is whose?"

**3.65** On October 2, 2009, E.U.P. was sued in U.S. District Court by a prior student (Aulner vs. E.U.P. University of

15

Pennsylvania et al. Filed: October 2, 2009 as 1:2009cv00247,) wherein Plaintiff Aulner filed complaint against E.U.P., alleging failure to act on substantiated allegations of sexual harrassment. Aulner's complaint cited numerous other male and female students raising harassment complaints, with failure by E.U.P. to respond in a timely manner to the complaints raised, in spite of promises to act.

**3.66** As a result of NELSON and SABLO's acts of bullying, abuse, and discrimination, which E.U.P. has defended and knowingly allowed to continue and has in fact contributed to, Plaintiff has suffered significant injury, which has manifested itself in a number of ways, including but not limited to the following: homelessness, anxiety, insomnia, hypertension, depression, social withdrawal, anger, fear, alienated relationships with family members and friends, and defamed character, when strangers thought that she was a threat to national security at the border.

**3.67** As of the date of filing, in addition to alleging that she had not committed any crimes, Plaintiff alleges that she was actually the victim of the theft of her firearm through a conspiracy between E.U.P. and the Erie County PA District Attorney's office. E.U.P. refuses to release record of disposal of the gun, with that request currently tied up in the PA Office of Open Records Appellate process as of the date of filing. Open Records Request sent to District Attorney Jack Daneri on 6/30/2010 went unanswered, indicating that the District Attorney's office is also refusing to release the information with no justifiable cause.

**3.68** E.U.P. did cooperate with Plaintiff in releasing the original property storage receipt and the original police blotter information which is kept on file by campus police stations for purposes of reporting campus crime to the Federal Department of Justice under the Federal Jeanne Clery Act. The blotter indicated that the Plaintiff had committed a "6111" offense which had been investigated and subsequently cleared by exceptional means. There was no date given for the date of the clearance of the crime. 18 Pa. Cons. Stat. § 6111, is the Pennsylvania statute that regulates the sale or transfer of firearms, addressing the time and delivery of manner, duty of seller, and duty of "other persons." Hence, false information was released regarding the Plaintiff, indicating that she had been investigated for a crime in an attempt to illegally sell a firearm in violation of 18 Pa. Cons. Stat. § 6111, that police were unable to make the arrest due to "elements beyond their control."

## IV. STATEMENT OF VIOLATIONS OF FEDERAL ACTS AND CODES

### COUNT ONE

### NEGLIGENT UNIFORM CRIME REPORTING BY A CAMPUS IN RECEIPT OF FEDERAL FUNDS IN VIOLATION OF 20 U.S.C. § 1092 (THE CLERY ACT.)

4.1 Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

4.2 IF Plaintiff did in fact commit a "6111" offense, there were no elements beyond NELSON and SABLO's control to prevent NELSON from arresting and formally charging the Plaintiff. Therefore, the crime(s) were not eligible to be cleared by exceptional means as defined by US Department of Justice Uniform Crime Reporting procedures.

4.3 IF Plaintiff did in fact commit a "6111" offense, Defendants violated The Clery Act, by failing to prosecute the Plaintiff, and instead deceived her and coerced her to spend the night in a hotel and go away quietly the next morning.  Plaintiff has kept E.U.P up to date with her contact information at all times since the incident.

4.4 Defendants actions were based on the Plaintiff's gender, race, socioeconomic status, and marital status.

4.5 IF Plaintiff did in fact commit a "6111" offense, Defendants violated The Clery Act by failing to properly record and maintain the nature, date, time, and general location of a crime; and the disposition of the complaint.

4.6 EUP and P.A.S.S.H.E.  has had actual notice of NELSON and SABLO's behavior and has been deliberately indifferent and in fact defensive of NELSON and SABLO in response to complaints about their misconduct.

4.7 The Defendants' negligent conduct was the proximate cause of Plaintiff's injuries.

### COUNT TWO

### DISCRIMINATION IN THE FORM OF RACISM AND GENDER BIAS IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

4.8. Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

4.9 Defendants NELSON and SABLO's discriminatory and abusive behavior toward the Plaintiff was based on her race, gender, socioeconomic and marital status as a woman leaving a man with intention of filing for divorce.

4.10 EUP has had actual notice of NELSON and SABLO's behavior and has been deliberately indifferent and in fact defensive of NELSON and SABLO in response to complaints about their misconduct.

17

**4.11** The Defendants' discrimination was the proximate cause of Plaintiff's injuries.

## COUNT THREE

### RETALIATION IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

**4.12** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**4.13** Defendant NELSON and SABLO's violation of civil rights was retaliation against Plaintiff because of her prior appeal of a parking ticket and her prior publicly voiced disproval of racism.  NELSON and SABLO's denial of civil rights and possible commission of crime under color of law, was in retaliation for NELSON receiving a report from professor Taylor that the Plaintiff was a stalker, and was based upon Plaintiff's report to NELSON of her estranged husband's harrassing text messages and emails because she had left him intending to file for divorce.

**4.14** E.U.P. and P.A.S.S.H.E., and specifically employees with the power to punish it, has had actual notice of NELSON and SABLO's civil and possibly criminal offenses and severe and pervasive abusive behavior towards Plaintiff. E.U.P. and P.A.S.S.H.E. have been deliberately indifferent to complaints about their misconduct.  E.U.P. has in fact been hostile and uncooperative towards many of Plaintiff's lawful record requests under open records law. E.U.P. and  P.A.S.S.H.E's  denial of civil rights under color of law, was in retaliation for Plaintiff reporting misconduct and complaining of poor policy instead of going away discretely.

**4.15** This indifference was the proximate cause of Plaintiff's injuries.

## COUNT FOUR

### HOSTILE ENVIROMENT AND UNLAWFUL EXPULSION ACHEIVED BY MEANS OF DECEPTION AND COERCION IN VIOLATION OF 42 USC §1983

**4.16** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**4.17** Specifically, defendants NELSON and SABLO, acting under color of Pennsylvania law, as representatives of E.U.P. and P.A.S.S.H.E., prejudiced and deprived Plaintiff with reckless and/or callous indifference to her state and federally protected rights, including but not limited to, rights secured by  the United States Constitution as well as rights secured by 20 U.S.C. § 1681 et seq. and in doing so were motivated by evil intent.

18

**4.18** Specifically, Defendants violated Plaintiff's civil right to personal safety and to be free from harm. With intentional malice and negligence, defendants NELSON and SABLO denied Plaintifff the right to due process of law and equal protection of the law. With callous indifference, Defendants E.U.P. and P.A.S.S.H.E. defended NELSON and SABLO's behavior involving coercion, intimidation and threats, of which Defendants had actual notice of and deliberately failed to take effective measures to remedy, instead threatening the Plaintiff further in response to her allegations of discrimination, abuse, and poor policy.

**4.19** Defendants' conduct proximately caused Plaintiff's injuries.

## COUNT FIVE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, DEGRADING TREATMENT, AND HUMILIATING TREATMENT IN VIOLATION OF THE VIOLENCE AGAINST WOMEN AND DEPARTMENT OF JUSTICE REAUTHORIZATION ACT OF 2005 AND 18 U.S.C. § 3771 AGAINST DEFENDANTS NELSON AND SABLO

**4.20** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**4.21** Defendants were aware through evidence provided by the Plaintiff to NELSON that Plaintiff was a victim of interstate cyberstalking by telecommunication device as defined by the federal Communications Act of 1934 [47 U.S.C. 223(h)(1)] and amended by the Violence Against Women and Department of Justice Reauthorization Act of 2005. Plaintiff had a legal right to be "reasonably protected" by NELSON and SABLO pursuant to 18 U.S.C. § 3771 (Crime Victims Rights.) Plaintiff had a federally protected legal right to be treated with fairness and respect for her dignity and privacy, and to be be reasonably protected from the accused offender. Within hours of receiving evidence of interstate cyberstalking from Plaintiff, Defendants failed to reasonably protect the Plaintiff, failed to provide equal protection under law, or to assist. They instead intentionally and/or recklessly inflicted additional distress on Plaintiff by discriminating against, threatening, intimidating, coercing and retaliating against Plaintiff on August 29, 2007 and again on August 30, 2007 by further humiliating Plaintiff with unlawful and embarrassing police guard as the only method she was permitted to retrieve her belongings. Defendants made no effort to treat Plaintiff with fairness and respect for her dignity and privacy, or to reasonably protect her from the accused offender. Instead, Defendants supported and contributed to the behavior of the accused offender.

**4.22** Defendants' conduct in response to Plaintiff's request for police assistance was performed with depraved

indifference.  Conduct involved witness intimidation, denial of due process, and violation of civil rights under color

of law which forced the Plaintiff into a state of homelessness while they were with knowledge that the Plaintiff was

already without a car.  Conduct was so wanton, so deficient in a moral sense of concern, so lacking in regard for

the Plaintiff's life, that it threatens the administration of justice at the most basic level.  NELSON"S and SABLO's

conduct was so outrageous in character and so extreme in degree as to go beyond the pale of decency and is

regarded as intolerable in a civilized society.

**4.23** Defendants' tortious conduct proximately caused Plaintiff's injuries.

**COUNT SIX**

### VIOLATIONS OF CONFIDENTIALITY RIGHTS  IN VIOLATION OF THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT (FERPA) (20 U.S.C. § 1232g)  AGAINST DEFENDANTS NELSON AND SABLO

**4.24** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**4.25** Contrary to Federal Educational Right to Privacy Act, (FERPA) defendants intentionally and/or recklessly

violated Plaintiff's legal right to confidentiality.  Without her permission, her rulebook violation was discussed with

her daughter, and with college professors, who then discussed the matter with her estranged husband  who

disemminated false information to numerous parties that Plaintiff had been "waving a gun around on campus and

acting psycho."  The ex-husband further told parties that Plaintiff had committed felonies but "got off the hook by

having sex for favors in a hotel room."  This breech of confidentiality has led to Plaintiff being in an ongoing state of

defamed character, due to suspicion to this day that the event had involved sex for favors in the hotel room.

**4.26** Defendants' conduct involving disregard for federally protected confidentiality rights threatens the

administration of justice at the most basic level and was so outrageous in character and so extreme in degree as

to go beyond the pale of decency and is regarded as intolerable in a civilized society.

**4.27** As a result of NELSON and SABLO's disregard for Plaintiff's confidentiality rights, which E.U.P. has defended,

Plaintiff has suffered significant injury, which  has manifested itself in a number of ways, including but not limited to

the following: homelessness, insomnia, anxiety, hypertension, depression,  social withdrawal, anger, damaged reputation, and alienated relationships with friends and family members who to this day question whether the Plaintiff was waving a gun around campus, acting "psycho" and got off the hook for felonies by having sex for favors in a hotel.

**4.28** Defendants' tortious conduct proximately caused Plaintiff's injuries.

**COUNT SEVEN**

### ATTEMPT TO ESTABLISH GUN REGISTRY UNDER COLOR OF LAW
### IN VIOLATION OF FIREARM OWNERS PROTECTION ACT 18 U.S.C. 926

**4.29** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**4.30** In response to Plaintiff's request for assistance in safely storing a handgun during an interstate move when leaving a financially and mentally abusive relationship, defendants failed to offer assistance, and instead punished and threatened Plaintiff for failure of the gun to be "registered."

**4.31** Defendants' conduct involving the attempt to establish a gun registry where none existed was in violation of the Federal Firearm Owners Protection Act [18 U.S.C. 926], under color of law of E.U.P. and P.A.S.S.H.E.

**4.32** Defendants' tortious conduct proximately caused Plaintiff's injuries.

### V. STATEMENT OF VIOLATIONS OF THE UNITED STATES CONSTITUTION
### UNDER COLOR OF LAW

**5.1** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**5.2** In addition to violating state and federal laws and Acts, defendants violated The United States Constitution on the following counts.

**5.3** Defendants' tortious conduct proximately caused Plaintiff's injuries.

**COUNT EIGHT**

**5.4.** Numerous violations of First Amendment freedom of speech, and right to petition.

## COUNT NINE

**5.5** Violation of the Second Amendment right to keep and bear arms.

## COUNT TEN

**5.6** Violation of the Fourth Amendment right against unreasonable search and seizure.

## COUNT ELEVEN

**5.7** Violation of the Fifth Amendment and Fourteenth Amendment regarding Due Process.

## COUNT TWELVE

**5.8** Violation of the Sixth Amendment right to fair and speedy trial, notice of accusation, right to counsel.

## COUNT THIRTEEN

**5.9** Violation of the Eighth Amendment right against cruel and unusual punishment.

## COUNT FOURTEEN

**5.10** Violation of Ninth Amendment unenumerated rights.

### VI. STATEMENT OF LAW REGARDING VIOLATIONS OF PENNSYLVANIA ACTS AND LAWS

## COUNT FIFTEEN

### ATTEMPT TO ESTABLISH GUN REGISTRY IN VIOLATION OF PENNSYLVANIA UNIFORM FIREARMS ACT- 1995

**6.1** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**6.2** In response to Plaintiff's request for assistance in safely storing a handgun during an interstate move when leaving a financially and mentally abusive relationship, defendants failed to offer assistance. defendants instead punished and threatened Plaintiff for failure of the gun to be "registered."

**6.3** Defendants' conduct involving the attempt to establish a gun registry where none existed was in violation of Pennsylvania Uniform Firearms Act- 1995, under color of law of E.U.P. and P.A.S.S.H.E.

**6.4** Defendants' tortious conduct proximately caused Plaintiff's injuries.

## COUNT SIXTEEN

### ONGOING DEFAMATION OF CHARACTER BY ACTUAL MALICE AND NEGLIGENCE IN VIOLATION OF 42 PA. CONS. STAT. § 8344 (PA UNIFORM SINGLE PUBLICATION ACT)

**6.5** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**6.6** In response to Plaintiff's request for assistance in safely storing a handgun during an interstate move when leaving a financially and mentally abusive relationship, defendants failed to offer assistance, and instead have continuously humiliated and defamed Plaintiff's character in writing and verbally by actual malice and negligence, claiming under color of Pennsylvania law that Plaintiff has committed crime(s) and/or is a national security threat. Alienated relationships and mental duress have resulted.

**6.7** Defendants' conduct is in violation of the PA Uniform Single Publication Act [42 PA. CONS. STAT. § 8344], (regarding defamation of character.)

**6.8** Defendants' tortious conduct proximately caused Plaintiff's injuries.

## COUNT SEVENTEEN

### VII. ONGOING GROSS NEGLIGENCE INVOLVING DEPRAVED INDIFFERENCE BY SUPPORTING DEFENDANTS NELSON AND SABLO'S DISCRIMINATORY ACTIONS AGAINST DEFENDANTS E.U.P. AND P.A.S.S.H.E. IN VIOLATION OF 42 PA. CONS. STAT. § 7102

**7.1** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**7.2** E.U.P. and P.A.S.S.H.E. knew, or in the exercise of ordinary duty as reasonable people should have known, of the necessity for exercising control over defendants NELSON and SABLO, their employees, but breeched that duty because they were given notice of the discriminatory enforcement of the rulebook by complaints raised by Plaintiff from December 2007 onward and failed to act. Subsequently, four student's have died due to discriminatory enforcement of the rulebook and inconsistent "zero tolerance" policy enforcement.

**7.3** E.U.P. and P.A.S.S.H.E.'s tortious conduct proximately caused Plaintiff's injuries, and directly contributed to the deaths of four other students due to discriminatory enforcement of the E.U.P. rulebook.

## VIII. VIOLATIONS OF PENNSYLVANIA CRIME CODE UNDER COLOR OF LAW
## AGAINST DEFENDANTS DANERI AND BOZICH

**8.1** Plaintiff hereby alleges and incorporates by reference the preceding paragraphs.

**8.2** Defendants DANERI AND BOZICH, acting as public officials under color of law of the Erie County flag, by and through their own actions and the actions of United States Border Patrol agents on their directive,  violated the Pennsylvania Crime Code in the following Counts.

**8.3**  Defendants DANERI AND BOZICH'S  tortious conduct proximately caused Plaintiff's injuries.

### COUNT EIGHTEEN

**8.4** 18 Pa.C.S. § 3303.   Failure to prevent catastrophe

### COUNT NINETEEN

**8.5**  18 Pa.C.S. § 2705   Recklessly endangering another person

### COUNT TWENTY

**8.6**  18 Pa.C.S. § 2906.  Criminal coercion.

### COUNT TWENTY ONE

**8.7**  18 Pa.C.S. § 4952.  Intimidation of witnesses or victims.

### COUNT TWENTY TWO

**8.8** 18 Pa.C.S. § 4953.   Retaliation against witness, victim or party.

### COUNT TWENTY THREE

**8.9** 18 Pa.C.S. § 903.     Criminal conspiracy.

### COUNT TWENTY FOUR

**8.10** 18 Pa.C.S. § 4101.  Forgery.

### COUNT TWENTY FIVE

**8.11** 18 Pa.C.S. § 4104.  Tampering with records or identification. (to conceal crime.)

### COUNT TWENTY SIX

**8.12** 18 Pa.C.S. § 4910.  Tampering with or fabricating physical evidence. (to conceal crime.)

**COUNT TWENTY SEVEN**

**8.13** 18 Pa.C.S. § 4911.  Tampering with public records or information.

**COUNT TWENTY EIGHT**

**8.14**  18 Pa.C.S. § 5101.  Obstructing administration of law or other governmental function.

**COUNT TWENTY NINE**

**8.15**  18 Pa.C.S. § 2902.  Unlawful restraint.

**COUNT THIRTY**

**8.16**  18 Pa.C.S. § 2903.  False imprisonment.

**COUNT THIRTY ONE**

**8.17**  18 Pa.C.S. § 3921.  Theft by unlawful taking or disposition.
**COUNT THIRTY TWO**

**8.18**  18 Pa.C.S. § 3922.  Theft by deception. (firearm)

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

**A.** Declare the Defendants' conduct complained of herein to be in violation of the Plaintiff's rights as

secured by:

42 U.S.C. § 1983;
18 U.S.C. § 3771
47 U.S.C. 223(h)(1);
26 U.S.C. ch. 53;
20 U.S.C. § 1681;
20 U.S.C. § 1232g;
 20 U.S.C. § 1092;
18 U.S.C. 926;
Violence Against Women and Department of Justice Reauthorization Act of 2005;
U.S. Constitution Amendments 1,2,4,5,6,8,9,14;
Pennsylvania Uniform Firearms Act;
Pennsylvania Uniform Single Publication Act (regarding defamation,libel,slander)
42 PA. CONS. STAT. § 7102 (regarding negligence)


**B.** Declare the defendants  DANERI and BOZICH'S conduct complained herein to be in violation of

Pennsylvania Crimes Code (Title 18) under color of law;

25

**C.** Declare the typewritten withdrawal contract entered between Plaintiff and Defendants NELSON and SABLO on August 29, 2007 NULL AND VOID pursuant to 42 Pa. Cons. Stat. § 5525 (relating to four year statute of limitations in contracts) because contract was deceptive, obtained under coercion, and was in violation of Pennsylvania Crime Code § 2906 regarding criminal coercion, and Pennsylvania Crime Code § 4114 regarding securing execution of documents by deception;

**D.** Declare all E.U.P. Judicial sanctions entered against Plaintiff as a result of above contract null and void, removing Plaintiff's permanent facilities restriction;

**E.** Award Plaintiff compensatory damages to be determined by the jury at the time of trial;

**F.** Award Plaintiff punitive damages to be determined by the jury at the time of trial;

**G.** Award Plaintiff SOLE EXCLUSIVE PUBLISHING AND MEDIA RIGHTS to the story;

**H.** Compel E.U.P. to issue written apology to the Plaintiff;

**I.** Compel E.U.P. to issue written apology to Douglas Spady for sending him to jail instead of a hotel;

**J.** Compel E.U.P. to issue written apology to the next of kin of Kieran McHugh,Domenico Crea, Sheldon Harmon, and John Eyrolles for not taking underage drinking and drug paraphernalia offenses as seriously as gun storage requests and emails, which could have prevented their family members' deaths;

**K.** Compel E.U.P. to conduct a public forum on issues such as racial and gender profiling, racism, zero tolerance policy, and forms of discipline in post-secondary education comparing the cases referenced herein.

**L.** Award Plaintiff reasonable costs, including the fees and costs of expert witnesses incurred in prosecuting this action; and

**M.** Grant such further relief as the Court deems necessary and proper.

**JURY TRIAL DEMANDED**

Plaintiff requests a jury trial on all issues triable to a jury.

_M. Elizabeth Cook_                    _7 July 2010_
Plaintiff, pro se                                    Date